# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

JOHN PEOPLES             :  CIVIL ACTION
                         :  NO. 08-CV-2024
        vs.              :
                         :
DISCOVER FINANCIAL       :
SERVICES, INC. and       :
DISCOVER CARD SERVICES,  :
INC. t/a DISCOVER CARD   :
                         :
        and              :
                         :
GINGER DAYLE, GINGER     :
DAYLE PRODUCTIONS and    :
NEW CITY STAGE COMPANY   :
                         - - -

        Oral deposition of JOHN F. PEOPLES,
ESQUIRE, taken pursuant to notice, in the
offices of LAW OFFICES OF JOHN F. PEOPLES,
2701 West Chester Pike, Suite 104, Broomall,
Pennsylvania, on Thursday, October 23 2008,
commencing at 1:36 p.m., before James J.
Gallagher Jr., Court Reporter, Notary Public.

        - - - - -

DIPIERO COURT REPORTING
Registered Professional Reporters
404 South 16th Street
Philadelphia, Pennsylvania 19146
(215) 735-8101



JOHN PEOPLES

Page 2

1    A P P E A R A N C E S:

2

LAW OFFICES OF JOHN F. PEOPLES
3    BY:  STEPHEN CRISTAL, ESQUIRE
2701 West Chester Pike,
4    Suite 104
Broomall, Pennsylvania 19008
5      Counsel for Plaintiff

6

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
7    BY:  BENJAMIN M. SCHMIDT, ESQUIRE
1735 Market Street,
8    51st Floor
Philadelphia, Pennsylvania 19103
9      Counsel for Defendant, DFS Services LLC

10

BY:  WILLIAM C. REIL, ESQUIRE
11   42 South 15th Street,
Suite 210
12   Philadelphia, Pennsylvania 19102
Counsel for Defendant, Ginger Dayle

13

14

15

16

17

18

19

20

21

22

23

24

JOHN PEOPLES

Page 3

1                                INDEX

2     WITNESS                                        PAGE

3     JOHN F. PEOPLES, ESQUIRE

4          By MR. REIL                              4

5          By MR. SCHMIDT                           63

6

7                                EXHIBITS

8

      NUMBER                DESCRIPTION           PAGE
9

      D-4                   LETTER                68
10

      PEOPLES-1             LETTERS/RECEIPTS,     83
11                          ETC.

12

13

14

15

16

17

18

19

20

21

22

23

24

JOHN PEOPLES

Page 4

1                    - - - - -

2               (It is stipulated and agreed by

3     and among counsel that the reading, signing,

4     sealing, filing and certification of the

5     within deposition be waived; and that all

6     objections, will be ruled on at the time of

7     trial.)

8                    - - - - -

9               JOHN F. PEOPLES, ESQUIRE, having

10    been sworn was examined and testified as

11    follows:

12                   - - - - -

13    BY MR. REIL:

14    Q.      Have you ever used an escort service?

15    **A.      Yes, I have.**

16    Q.      Okay.

17         And on what occasions?

18    **A.      Probably for the last 20 years.**

19    Q.      Okay.

20         Have you ever referred to Ginger Dayle as

21    an escort service?

22    **A.      Yes, I have.**

23    Q.      You've referred to Ginger Dayle as an

24    escort?

JOHN PEOPLES

Page 5

1   **A.      As an escort, yes.**

2   Q.      On what occasions?

3   **A.      Probably all throughout, I think,**

4   **February of 2008 until I stopped using her,**

5   **which I don't know the exact date, but it**

6   **might have been in that summer.**

7   Q.      Okay.

8        Is it your contention that Ginger Dayle

9   is a prostitute?

10   **A.      Yes.**

11   Q.      Okay.

12        What is the factual basis for that

13   statement?

14   **A.      Because I paid her and she had sex**

15   **with me and there was an understanding that it**

16   **was a payment for sex.**

17   Q.      Okay.

18        Can you give me an estimate, Mr. Peoples,

19   on how many occasions did you pay Ginger Dayle

20   for sex?

21   **A.      Maybe 20, 25, but that's only a**

22   **guess.**

23   Q.      I understand.

24        And when you paid her, were any of the

JOHN PEOPLES

Page 6

1   payments by cash?

2   **A.    Very few, if any.**

3   Q.    Okay.

4   Were any of the payments by credit card?

5   **A.    They were by credit card.**

6   Q.    Okay.

7   Did you use your Discover Card?

8   **A.    Yes, I did.  Most of the time I used**

9   **the Discover Card -- almost all of the time.**

10   Q.    To pay Ginger Dayle for sex?

11   **A.    Yes, that's correct.**

12   Q.    Were there any occasions when you

13   used your Discover Card to pay Ginger Dayle

14   that it wasn't for sexual favors?

15   **A.    No.**

16   Q.    Now, I don't know in terms of your

17   disability so you can answer this for me; have

18   you ever seen any photographs of Ginger Dayle?

19   **A.    There are photographs on the**

20   **computer, but I really don't have enough**

21   **vision to really see them.  Somebody has to**

22   **look on the computer for me to pick them out.**

23   Q.    Okay.

24   **A.    I mean, I can tell that there is a**

JOHN PEOPLES

Page 16

1    **A.        You know, she got undressed, you**

2    **know, I went up and down and touched her and**

3    **she is anatomically endowed, you know, very**

4    **much so.**

5        Q.      Where did that occur?

6    **A.        In her apartment.   It all occurred in**

7    **her apartment.**

8        Q.      Now, each time you had sex with her,

9    right, did you pay her for the sex?

10    **A.        I did, with the credit card.**

11        Q.      So each time there was sexual

12    intercourse as you allege between you and Ms.

13    Dayle it was paid for by a credit card?

14    **A.        I believe every time.   See, I had**

15    **trouble with girls stealing cash, so I figured**

16    **this was a way that they couldn't screw me up**

17    **with the credit card.   I found that wasn't**

18    **true.**

19        Q.      So you paid for Ms. Dayle as a

20    prostitute with a credit card; is that your

21    testimony?

22    **A.        That's right.**

23        Q.      Now, I think it came up in discovery

24    or something like that that at one point your

JOHN PEOPLES

Page 29

1    Now, there were some receipts that you

2    signed for Ms. Dayle; is that correct?

3    **A.     Yes.  I would scribble on them.**

4    Q.     Now, is it your contention that she

5    signed your name?

6    **A.     She signed a couple of them because I**

7    **wasn't there.  She also -- she overcharged me**

8    **and she -- she overcharged me.  She also said**

9    **I came twice.  She doubled the amounts as**

10   **well.  She also signed some where I wasn't**

11   **there those days.**

12   Q.     All right.

13   Did you specify in any writing -- there

14   is a lot of paper in this case, as to what

15   receipts -- I mean, date-wise, that you think

16   that she forged your name?

17   **A.     I think Steve would know that more**

18   **than I would am.**

19   Q.     How many receipts do you think

20   approximately she forged your name on?

21   **A.     Was it three or four?  I don't know.**

22   **Three or four or five.**

23   Q.     Okay.

24   Now, how long were you seeing her at her

JOHN PEOPLES

Page 53

1   it.  I'm not look you guys, you know,

2   dictating everything.

3       Q.      Is that your signature on there?

4       A.      No.  That's hers, but that's

5   essentially the truth, yes.

6       Q.      Okay.  I see.  All right.

7       Did you say in that letter -- did you

8   tell Discover that you were alleging that you

9   were paying for a prostitute?

10      A.      No, but I think she said she was an

11  escort.  What do escorts do?

12      Q.      I don't see the word escort in that

13  particular letter.

14      A.      I think maybe we told them on the

15  phone.

16      Q.      I see.  Okay.

17      Now, the essence of your claim against

18  Ms. Dayle is that she overcharged you for

19  prostitution services; is that correct?

20      A.      Right.

21      Q.      Okay.

22      Was there a rate agreed?  You say you

23  never signed that contract?

24      A.      No.

JOHN PEOPLES

Page 54

1    Q.        What was the agreement for?

2    **A.        $375 an hour.**

3    Q.        Which happens to be, I think, the

4    same figure on her Pilates contract, correct?

5    **A.        Yeah.  Now, it wasn't -- it was --**

6    **her amount originally was, I think -- I think**

7    **she charged me $25 extra for the credit card.**

8    **She increased her to rate to other people but**

9    **not to me because I saw her enough times, et**

10   **cetera.**

11   Q.        So it's sort of a volume --

12   **A.        $375 times two is what we did.**

13   Q.        And $375 an hour, what did that

14   cover?

15   **A.        Two hours of her time.**

16   Q.        Okay.

17           Did it cover any particular sexual

18   practices?

19   **A.        No.  It was whatever she did.  It was**

20   **the time, not the practices.**

21   Q.        Okay.

22           When you paid her, as you allege, did you

23   ever ask her to do anything that she failed to

24   do?

JOHN PEOPLES

Page 55

1   **A.    I told you, she didn't do anal sex.**

2   Q.    And did you ask for some sort of a

3   refund?

4   **A.    No.  She didn't do it and that was**

5   **the end of it.**

6   Q.    Okay.

7       Now, how much money do you estimate that

8   you were overcharged and how did you arrive at

9   that?

10  **A.    Well, my mom offered that.  We looked**

11  **at the -- several days I was not there.**

12  **One day she charged me $2,200 when I probably**

13  **spent $750.  As I said, there were several**

14  **other days that I wasn't there at all and she**

15  **charged me for them.  So when you add up the**

16  **$350 that she overcharged me on I don't know**

17  **how many days, maybe seven, eight, nine, ten**

18  **days and then the fact that she was -- she**

19  **charged me for days that I wasn't there -- I**

20  **don't know.  I think they came to $8,000 or**

21  **something like that.**

22  Q.    So you went over with your mom the

23  days and the receipts and the figures and your

24  mom helped you to arrive --

JOHN PEOPLES

Page 57

1    Q.    You asked Discover Card for your

2  money back essentially, correct?

3    **A.    That's reason.**

4    Q.    And what reason did you give them

5  that they should give you your money back?

6    **A.    I told them that I had been cheated,**

7  **that I couldn't see and that if I had been**

8  **able to see and she had overcharged me that,**

9  **you know, this wouldn't have happened and I**

10  **told them.  In the beginning they took the**

11  **charges off and then they decided to change**

12  **their mind about that.  I did tell them that I**

13  **thought that they had an obligation under the**

14  **ADA to challenge these payments and I still**

15  **think that's true.**

16    Q.    You said you told the folks at

17  Discover that you had been cheated; did you

18  tell them that you were cheated by a

19  prostitute?

20    **A.    Yes.  If you look at their answer, I**

21  **think it's very clear they knew what it was.**

22    Q.    Now, when you gave Ms. Dayle your

23  credit card, was that voluntary or did she

24  ever take it without your permission?

JOHN PEOPLES

Page 58

1    **A.    Whenever I gave her -- see, she**

2    **didn't have to run -- apparently, she could do**

3    **it without my credit card, but I used to give**

4    **it to her and she would run it through her**

5    **machine.**

6    Q.    Okay.

7    Every time Ms. Dayle had your credit

8    card, was it voluntary on your part?

9    **A.    Yeah, I gave her the credit card.**

10    Q.    Okay.

11    Did you ever ask her when that receipt

12    came back, did you ever say, Ginger, would you

13    write down the amount of money that you just

14    told me on that receipt?

15    **A.    No.**

16    Q.    Why not?

17    **A.    Well, I saw no reason to do that.**

18    **Really, if you think about, that isn't going**

19    **to -- if she was going to cheat me, would that**

20    **really work.  She could write $750 for me and**

21    **put $1,100 on there.  That wouldn't work.  Do**

22    **you understand?  If there was a way that you**

23    **could get, say, a copy of the receipt and I**

24    **could tell what it was, that wouldn't work.**

JOHN PEOPLES

Page 59

Q.     So basically you trusted the
prostitute?

**A.     I had to trust the prostitute.  There
was no real way -- until my mom told me what
was on that receipt I was in the dark.  I have
tons and tons of receipts.  There is no way
that I can watch all these receipts.  Quite
honestly, when I'm out most of the time I'm
with the drivers and they fill out all of the
receipts and they look at everything and they
read everything to me.  Now, obviously they
couldn't read that to me and that's why she
was able to cheat me.**

Q.     As part of your practice as a
collection attorney, would you go over
receipts from time to time?

**A.     No, I couldn't do that.  The
paralegal did that.**

Q.     In a timely fashion?

**A.     Are you talking about their bills,
bills I would have to look at?**

Q.     Yeah.

**A.     No, they would do it.  The paralegals
did that.  I couldn't really read -- you know,**

JOHN PEOPLES

Page 63

1    do some brief follow-up.

2              MR. CRISTAL:  Could we take two

3    minutes.

4              MR. REIL:  Sure.

5              (A discussion was held off the

6    record and a short recess was taken.)

7    BY MR. SCHMIDT:

8       Q.     Mr. Peoples, when you visited Ms.

9    Dayle you voluntarily handed your credit card

10   to her; is that correct?

11      **A.     That's correct.**

12      Q.     When she prepared a receipt, did you

13   sign most of the receipts?

14      **A.     I did.  The way I sign, it was just**

15   **scribble.**

16      Q.     Do you recall approximately how many

17   receipts you contend that you did not sign?

18      **A.     Three or four I didn't sign at all.**

19      Q.     Even if you didn't sign it, did you

20   receive the receipts nonetheless?

21      **A.     I got the receipts -- I got the**

22   **receipts from Discover, but I never gave her**

23   **the credit card for that.**

24      Q.     Generally, was it standard procedure

JOHN PEOPLES

Page 64

1  for her to give you a copy of the receipt to

2  take with you?

3    **A.     When I handed her the credit card she**

4  **gave me a receipt back just about every time.**

5    Q.     Can you tell me the dates that she

6  didn't give you a receipt?

7    **A.     No.  I think that Steve can tell you**

8  **that.**

9    Q.     Are you alleging that there are any

10  incorrect charges for transactions on days

11  when she gave you a receipt?

12    **A.     Yes.**

13    Q.     Because --

14    **A.     She overcharged me maybe eight, nine,**

15  **ten times and she also charged me that I**

16  **visited twice on -- there was one for $2,200**

17  **in one day, you know, that's just -- you know,**

18  **I could not have stayed anything like that.  I**

19  **usually stayed two hours.**

20    Q.     Thank you.

21      When you took the receipt with you, could

22  you have shown it to someone else, anyone

23  else?

24    **A.     Not until after I was done.**

JOHN PEOPLES

Page 67

1    **A.      I would have to call everybody then**

2    **and I use Discover almost exclusively, so I**

3    **would have to call 20 times a day t check all**

4    **of them out.**

5    Q.      Was there anything that prevented you

6    from calling on only large amounts?

7    **A.      Well, even there, I had probably four**

8    **or five large amounts a day, you know, $100,**

9    **$200.  We had a lot of things in the office**

10   **here where I ordered things on the phone and**

11   **did other things.  It would just be impossible**

12   **for me to check them all the time and I had no**

13   **reason to do that.**

14   Q.      Would you have been capable as a

15   blind person of using the telephone to call

16   Discover had you chosen to do so?

17   **A.      Yes, I would.**

18   Q.      Okay.

19   **A.      But as I said, I would have to be**

20   **calling them everyday and they would get a**

21   **little tired of it too.**

22   Q.      Well, are you aware that you could

23   call an automated menu and get a recording of

24   all your charges?

JOHN PEOPLES

Page 68

1    **A.        No, I wasn't aware of that.**

2    Q.        Do you deny that there is one?

3    **A.        Oh, I don't know, but if you say**

4    **there was, I suspect there was.  Anything with**

5    **credit cards I had to have my mom or my**

6    **paralegal do it.**

7                    MR. SCHMIDT:  I'm marking

8    DFS-00279 as Defendant's Exhibit-4.

9                    (Document was marked as D-4 for

10   identification.)

11   BY MR. SCHMIDT:

12   Q.        This is a letter dated February 11th,

13   2008.  I'm going to read to you one line.

14                   MR. CRISTAL:  Was this the one

15   that was read before?

16                   MR. SCHMIDT:  Yes.

17   BY MR. SCHMIDT:

18   Q.        Due to my frail health, my workday is

19   from 2:30 p.m. to 7:00 p.m., 90 percent of the

20   time is spent reclining on the couch where I

21   conduct business on the telephone.

22   **A.        That's correct.**

23   Q.        So you're able to speak on the

24   telephone for hours and hours a day?

JOHN PEOPLES

Page 69

1    **A.      Yes.  I don't speak hours a day, but**
2    **I speak a little bit on the telephone.**
3    Q.      Well, 90 percent of the time between
4    2:30 p.m. and 7:00 p.m., five days a week?
5    **A.      Most of the time I just lay there.  I**
6    **don't use the phone.**
7    Q.      Okay.
8    **A.      I mean, I'm able to call -- I would**
9    **be able to call Discover.  I didn't know they**
10   **had an automated hotline.  As I told you, I**
11   **would be calling them everyday about a number**
12   **of card chits, the receipts, and that is not a**
13   **proper use of my time.**
14   Q.      Did you receive monthly billing
15   statements from Discover Card?
16   **A.      Yes, I did.**
17   Q.      Are there any months you contend that
18   Discover Card did not mail to you a monthly
19   statement?
20   **A.      I don't think so.  And when I picked**
21   **up the monthly statements, my mom told me**
22   **about them and we did something about it.**
23   Q.      Who reads your monthly statements?
24   **A.      My mom would go over them and if she**

JOHN PEOPLES

Page 73

1   letter from Discover says thank you for your

2   recent inquire so.

3                  THE WITNESS:  I mean, I just --

4   it's not that we didn't want to fill it out.

5   Maybe we fouled up, but we thought we

6   complied.

7   BY MR. SCHMIDT:

8   Q.      Have you ever thought that as an

9   attorney licensed in Pennsylvania that perhaps

10  you should not use a prostitute because it's

11  illegal?

12  **A.      It doesn't bother me because it**

13  **doesn't affect my practice of law.**

14  **Prostitution, I believe, is a misdemeanor.**

15  **Even if convicted, it would not be a problem**

16  **for the disciplinary board.**

17  Q.      What is the first day that you

18  contend you were aware that Ms. Dayle

19  allegedly overcharged you?

20  **A.      It might have been July or -- you**

21  **know, it was a couple days before we informed**

22  **you of this.**

23  Q.      Do you have a month?

24  **A.      You know, I'm not -- when did I stop**